ULRICI (UNITED STATES v.). See Case No. 16,594.

---

## Case No. 14,330.

### The ULYSSES.

[5 Law Rep. 241; 1 Brunner, Col. Cas. 529.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1800.

MISCONDUCT OF SEAMEN—DEPOSING AND CONFINING MASTER—FELONIES—CONSTITUTIONAL LAW.

[1. The offence of seamen who revolt against the master, and place him in confinement, continuing the voyage under the mate, is not a felony.]

[2. The power of congress to punish offences committed on the high seas, below the grade of piracy or felony (which are expressly provided for in the constitution), may be sustained under the provison conferring power to regulate foreign commerce.]

The Ulysses, a merchant ship of Boston, sailed from that port on the 25th of August, 1798, on a voyage to the Northwest coast of America, at that time regarded as a most hazardous and difficult undertaking. Nothing material occurred till their arrival at St. Jago, where a lad going on shore and not returning in due season, was left by the captain. In the course of the voyage, between St. Jago and the Falkland Islands, the gunner was suspected by the whole crew of having committed depredations on the breadroom; upon which he was put in irons, and, at his own request, was put on shore at the Falkland Islands, where they soon after-

[1] [1 Brunner, Col. Cas. 529, contains only a partial report.]

wards arrived. Here, three of the crew, discovering an uneasy disposition, and a mutinous spirit, were severely beaten by the captain, who put them in irons. Off Cape Horn, John Salter, the first officer, took a lunar observation, and by his calculation they were in longitude sixty-nine degrees and some minutes west from Greenwich. This differed materially from the captain's calculation by the dead reckoning, and originated a quarrel between them, which was pursued with mutual violence and invective. On January 24, they were in imminent danger of running aground on Terra del Fuego, from which they escaped by the prudence of Captain Lamb. The quarrel between him and the mate was revived by this circumstance, and the next day the latter was degraded for incapacity, as was entered in the log book, and was turned before the mast. The voyage was then pursued without any remarkable occurrence, till April 30, when the crew revolted, seized the captain, put him in irons, imprisoned him in his stateroom, and transferred the command to Salter. They had previously signed a paper containing their reasons for the revolt. These were, the captain's intemperance. which incapacitated him for the command, and had, in two instances, endangered the safety of the ship; and second, the fear, that in a moment of passion, he would leave some of them on some desert island, or on some inhospitable coast, as he had frequently threatened. The ship continued under Salter, in this revolted state, for ten days, when they arrived on the Northwest coast, where by the interposition of Captain Rowan, of the Eliza, and Captain Breck, of the Hancock, ships belonging to Boston, the crew returned to their duty, Captain Lamb was reinstated in his command, and the officers were imprisoned. On the return of the ship to Boston, the three officers, John Salter, John Carnes, Stephen Bruce, Jun., and two seamen, John Bullock and Edmund Smith, were indicted in the circuit court of the United States, for feloniously confining the master of the Ulysses, and endeavoring to excite a revolt in the ship. The case being of a somewhat novel character, and there being an impression that the crew,' before confining the captain, had good reason to fear that he intended to leave some of them amongst the savages on the Northwest coast, excited much interest, which was greatly enhanced by the fact that the most eminent counsel of that day were engaged on either side. The trial took place before the circuit court of the United States at the October term, 1800, before WILLIAM CUSHING, Circuit Justice of the United States, and JOHN LOWELL, District Judge. The case was conducted, on the part of the defendants, by Theophilus Parsons and Fisher Ames. For the government, by Harrison Gray Otis, and John Davis, district attorney of the United States.

It appeared clearly in evidence, that the defendants confined the master, and, indeed, they did not deny the fact, but set up a justification of their conduct.[2]

Fisher Ames, in opening the defence, stated, that he could with pleasure leave the cause in the hands of the jury, without attempting to influence either their hearts or understandings. He confessed the necessity of subordination among sailors, but denied that the acquittal of the defendants would weaken the authority of masters, who would be restrained by it, not from preserving discipline. but from acts of cruelty. At most, it would be but an exception from the general rule, requiring subordination. The consequence of leaving sailors to the brutal ferocity of captains, would be piracy and death; it would be more fatal to the interests of commerce, than restraining ship government within strict and definite limits. He laid it down as a principle, that when men act from honest motives, they cannot be considered as criminals; and, if the defendants were really in fear of their lives, it sufficiently justified their conduct. That fear might be ill-founded; but its reality was their justification. Self-defence is a supreme law of nature. It is written in the heart,

[2] Salter applied for a separate trial, that he might have the privilege of peremptorily challenging the jury. His counsel urged, that it was the privilege of persons, indicted for felony. But by the thirtieth section of the act of April 30, 1790, on the twelfth section of which this prosecution was founded, the privilege of peremptory challenge is restricted to capital cases: and on this, the motion was overruled. The following points were ruled in the course of the trial: It was not permitted, that witnesses should testify, what others said of the defendants, unless they were present. It was not permitted to testify, what others said, respecting expressions, used by defendants, unless they were present. What others said, when the defendants were not present to contradict, is no testimony. If the defendants, before the accusation, were said to have used expressions, which they did not deny, it is good evidence, because it is a confession, that they did utter the expressions. It was not permitted, to show, that Capt. Lamb was cruel, after his reinstatement. If this might have been done, it would have been equally proper, to enter into his general character, through every period of his life. In criminal prosecutions, depositions are not admitted as regular evidence, unless by mutual consent. The deposition of W. Sturgis was offered. Mr. Davis, the attorney for the district, objected to its being read, on account of unfair practice. After he had consented to a deposition of Sturgis, some addition was made to it. Though this addition might have been true, yet Mr. Davis had no opportunity to cross-examine Sturgis on this point. The court did not consent to its admission. Where there are several defendants, and one consents to the taking of a deposition, that deposition may not affect the other defendants, who did not consent to the taking of the deposition. Where a private journal was produced, that journal may he used against its author, but not against the other defendants. Evidence to show, that a witness has given an account of a transaction, in a manner similar to what he has testified, is good corroboration of his testimony. And so vice versa. Several were concerned in this revolt. Some who were concerned, and who were under bonds to answer in another district,

and cannot be obliterated. If men make laws to restrain it, their voice will not be heard in the moment of danger.[3]

The crew complained of the want of provisions. Mr. A. remarked on the effects of hunger in a small degree. It keeps the mind in a constant state of irritation. An uninterrupted series of small vexations, which individually require no magnanimity, will, in the course of time, humble and conquer the greatest spirit. The crew complained of the want of rum, to deprive sailors of which, said Mr. A., has always been considered as depriving them of the rights of man.

The crew accused Lamb of intemperance.[4] An intemperate use of rum has various effects on different constitutions. It deprives some of the powers of their body; some it makes loquacious, unlocking the secret recesses of the mind; it makes some very foolish, and others ferocious, adding to their nerves, strength, and to their intellects, fire. It converted Lamb into a tiger. When he came from his cell, he resembled an Eastern despot, who delighted only in scattering fears, and in inflicting torture. He compared Lamb to a giant, whose twisted nerves, and black countenance, would appal the stoutest heart. He eulogized sailors, as the most sincere and heroic of men. Among them, the purest and most exalted friendship subsists, and almost only among them. Their whole life is on the scale of heroism, and it is only because it is common, that they are insensible of their heroic character. The character of the sailors of New England is superior to that of those of any other nation. During the war, few of them ever entered on board an English vessel of force, without soon deserving and receiving an honorable commission.[5]

Theophilus Parsons:

This prosecution is founded on a law of congress, but I do not fear the accusation of want of attachment to the federal government by asserting, that the clause of the act, on which the indictment is founded, is unconstitutional. I have been accused of the wish to elevate that power on the ruins of the state government. This I disavow. I consider the state governments the pillars, on which the federal arch stands, and the federal constitution as the key-stone of the arch: they mutually impart strength and beauty.

The defendants are accused of endeavoring to make a revolt. To show what a revolt is, he quoted Johnson's Dictionary, folio, on this word. It signifies a departure from one power, and going over illegally to another. But to whom did the sailors go over? If to Mr. Salter, to whom did he revolt?

2. Is the offence, with which the defendants stand charged, felony? If so, it must be either by common law, or by the statute. It is not by the common law, because that code extends not to offences, committed on the high seas. If it had been meant to be felony by the statute, it would have been so expressed. I do not know, that we have a right to supply the omission of congress, even if it were their intention to declare this offence felony. Laws ought to be clear. Congress has power, by the constitution, to define and punish all piracies and felonies on the high seas. If this offence is neither piracy nor felony, congress had no jurisdiction, and therefore this clause is unconstitutional.

3. Admitting the fact, I ask with what intention did the defendants confine Capt. Lamb, and make this revolt. It is the felonious intention, which constitutes the crime. A man may kill another, but if it is by accident, or if from self-defence, and in a justifiable cause, the guilt of murder cannot attach to him. If the defendants had acted with a felonious intention, wherein, I say, the guilt of the offence consists, they would either have perpetrated murder, or run away with the property. They committed no murder. If they had run away with the property, it

---

but who were not indicted, were offered to testify in behalf of the defendants. Objection was made to their testimony. They had every inducement to swear, so as to clear these defendants, in the hope of receiving a similar return of kindness. Court determined, they were competent, and their probable interest affected only their credibility. It was asserted, that P. Robinson, a witness, had told the American consul, at Canton, a story differing in some considerable circumstances from the testimony which he had given in court. He was asked, what story he had told the consul? but the court adjudged the question illegal, as he was not bound to criminate himself. Soon after Capt Lamb's reinstatement, P. Robinson wrote an account of the revolt, and gave it to the captain. This account was offered, to corroborate the testimony, which he had already given in court. It was admitted, as to those circumstances, which he had testified. It was doubted, whether the log book was the record of the mate, or of the captain. Captains of vessels were produced, who testified, that the log book is always to be considered as a record of truth; that it is the duty of a mate to keep one for the inspection of the owners of the ship: the mate is not bound to insert therein any thing false, even though commanded by the captain; and therefore a log book may be taken as the confession of the mate. I have said, depositions are not legal evidence in criminal prosecutions. One was offered by Salter, and it was moved, by his counsel, that it be accepted. Salter had no means legally to detain the deponent, but it was evident, that he had evidence in existence. Court said,—If the attorney for district will not agree to the admission of this deposition, the cause must be continued. A similar determination of Lord Mansfield was quoted, in which he was said to have asserted, if the deposition were not admitted, the cause should be continued forever. The attorney agreed.

[3] Mr. Ames recapitulated the evidence, but I thought imperfectly. His observations were in some instances more uncandid, than his duty to his clients required.

[4] But of this there was not sufficient proof.

[5] The preceding are heads of Mr. Ames's argument. It was addressed principally to the feelings. I could not preserve its exact order, or correctness, or beauty.

would have been piracy, and of this they are not accused. But from their conduct, we may infer the purity of their intention. They pursued the voyage, and traded with the natives of the country, with the express view of doing for the owners, as they would have done, had they been present. It is a correct rule, that where certain facts exist, we are to consider the probable cause of their existence. This will assist our investigation of the true cause. It is clear, they could not act without some motive, and it is equally certain, they had neither murder nor theft in their hearts. It must then have arisen from necessity, from a sense of eminent hazard of their lives, from the right of self-defence, which is imprinted in the heart, and which is superior to all law.

4. On the subject of Capt. L.'s testimony, Mr. P. observed, that it is true, in one sense, he neither gains nor loses by the event of this trial, and on that account is a competent witness. But, has he not a character to gain or lose, or is he a bankrupt in reputation? Has he not the strongest human feelings of resentment and revenge to gratify? Almost every active motive, which influences human conduct, impels him to color his evidence, and to effect the conviction of the defendant. Besides, when a man is under the influence of strong feelings, he easily persuades himself to believe, that that is true, which is most for his interest to be true. He then noticed some omissions of important matters in L.'s evidence, exaggerations, and attempts to influence the witnesses. One of these he had supported for some time, and supplied with money.[6]

5. Leaving Charles Read at St. Jago, discovered the greatest cruelty in Capt. L. A youth of respectable connections, without experience, committed to the care of Capt. L., who was bound both by feeling and duty, to protect him, was left at an immense distance from his native country, among strangers, with whose language he was unacquainted, without the power of making himself known, and without the means of subsistence. The young men of New England, who engage in this hard life, are generally of respectable connections, of good education, and hope, in the course of time, to rise to respectability in their profession, and to political eminence among their fellow citizens. Of this number was young Read, left in this desolate condition, his fair and honest hopes cut off in their very birth. Had Capt. L. been a parent, what would have been his feelings; had Read been his son, what would have been his indignation! The crew of the ship applied to Capt. L. for permission to bring Read on board: but to this application he only returned language, the fit

offspring of such a heart! He damn'd Read, and swore, that he would not send for him, if he were his brother. Can it surprise us, that this conduct inspired the crew with fear and detestation!

6. Putting the gunner in irons on suspicion merely, was regarded as a severe punishment, even had he been really guilty, and showed Capt. L.'s temper to be ferocious, delighting in inflicting pain. Mr. P. called him a despot, being both a judge and executioner, examining without deliberation, and punishing with the utmost violence.

Mr. Parsons defended the prisoners with the most energetic eloquence; and Mr. Otis, with equal eloquence, and with more candor, supported the prosecution. Mr. Davis, with his usual, and almost proverbial candor, recapitulated the evidence for the government. In the course of his observations, he applied one from Hooker. "He that goes about persuading men they are not so well governed as they ought to be, will never want adherents."

Harrison Gray Otis closed the pleadings. In relation to the first position, taken by Mr. Parsons, he said; the crew did make a revolt; this necessarily includes the endeavor to make one. They departed from the legal authority of their commander, and went over to the dominion of their unlawful and uncontrolled will. The revolt consisted in the departure from their duty.

2. Upon the second point, he said; felony has a popular and a technical signification. In the former, it is an offence committed with a corrupt, malignant, and evil intention. Congress undoubtedly had the right to use this expression in either sense. They were describing offences against the United States, and undoubtedly considered this offence as felonious. In this same act, they speak of theft on the high seas, but omit the term "felonious." If a person, charged with theft on the high seas, were indicted, and the term "felonious" omitted, would not that omission be sufficient cause to quash the indictment? This whole act is a transcript of the British statute, in which this very offence is felony, and punished with death. Because congress meant to lessen the offence, and meliorate the punishment, could they mean to make it no offence? For if it is not felony, it is not within the powers of congress; and, being out of the reach of the common law, it cannot be punished.

This question called forth much learning and ingenuity. The etymology of the word was investigated. It was further suggested by Mr. Otis, that congress having power to define and punish felonies on the high seas, it was to be supposed, that when legislating on this offence, they were legislating on a felony.

Mr. Parsons. That is, because congress is legislating on an offence, it is felony. It is a pernicious doctrine.

THE COURT thought this doctrine strain-

---

[6] This was justified by the necessity of the case. Lamb had not power to compel the witness to stay, and therefore made it for his interest. This is not a legal exception. 2 Bac. Abr. 592.

ed, but stopped the discussion, as belonging properly to the court. It would be ground for a motion in arrest of judgment, and ought not to be addressed to the jury.

3. The felony consists in the very act of confining the master, and making the revolt. The law says it is an offence, and they may not make a revolt, even with the intention of pursuing the voyage. Their asserting it to be their intention to pursue the voyage, does not authorize their conduct. We grant, that fear is a sufficient justification, but not every fear. To justify this crew, · it must have been lawful for them, not only to confine the master, but, in case of resistance, to put him to death.

4. Upon the fourth point discussed by Mr. Parsons, Mr. Otis acknowledged, that Capt. L. must be under the influence of strong passions, but perhaps, not more so than the witnesses in behalf of the defendants. They were all engaged in one common cause; they had a fellow feeling. Their interest and their reputation were engaged equally with Capt. L.'s. Capt. L. had not designedly omitted any thing. If he had omitted facts, it arose from the negligence of his counsel, who had omitted to interrogate him, and not from his crafty design. His evidence had been confirmed in all its principal parts. It was not pretended, that he was not a warm man, imprudent, and perhaps a rigid disciplinarian: but it did appear, from all circumstances, that the defendants were equally warm, imprudent, and perhaps violent.

5. In relation to leaving the lad at St. Jago, Mr. Otis said: The situation of Capt. L., and the circumstances of the crew, at the time amply justify his conduct. The Ulysses had stopped at St. Jago for water. This Read knew. The water was procured, the boats were taken in, and the wind was fair: the crew were in liquor, and when they applied to Capt. L., it was late in the evening. It was an order of the governor of St. Jago, that no boat should come on shore in the evening. Whoever infringed this law would be fired upon. Capt. L. had the charge of a valuable cargo worth $40,000. Had he stopped till morning, he might have lost the opportunity of a fair wind, he might have been exposed to shipwreck, and thus, the hopes of a valuable voyage would have been ruined. Capt. L. acted, then, as every prudent and good man ought to act.

6. In regard to the treatment of the gunner, the captain acted upon the suspicion of the whole crew, as well as his own. He was engaged in a long· voyage; it was necessary to preserve strict economy; and if an individual committed depredations on the provisions, he would deserve the most severe punishment. It was not to be expected, that legal forms were to be observed. There were circumstances which justified the suspicion which fell on the gunner. Perhaps Capt. L. was too severe, but it was a necessary severity. Much was said on the con-

duct of Capt. L. at the Falkland Islands, where it was acknowledged, he was guilty of excess. It was denied, that Salter discovered incapacity, or deserved to be degraded. It was proved, however, that he had been found sleeping on his watch. It was clear, that Salter, excited by disappointment, and revenge, had stimulated the crew to mutiny. He told them, that he knew the laws of America, and that when two-thirds of a crew agreed, they might depose their captain. Some · of the crew, in their evidence, confessed, that though Capt. L. was a violent man, using most intemperate language, and threatening to heave some overboard, and to leave others on some desert island, or on the N. W. coast among the natives; yet, they regarded them merely as words of passion, and never feared, that he would attempt to realize his threatenings. They signed the paper from motives of personal safety. Besides, it was urged, that, to justify their revolt, they ought to have stopped · till Capt. L. should attempt to leave them on shore, or to throw them overboard.

[Before CUSHING, Circuit Justice, and LOWELL, District Judge.]

CUSHING, Circuit Justice, committed the cause to the jury. He addressed them for about ten minutes, and, with great impartiality noticed everything of importance. He seemed to consider the charges in the indictment supported, and that the justification was not sufficient. The jury found the defendants guilty. A motion was made for an arrest of judgment, on the ground that the offence was not felony. This was argued on the ground already mentioned. The court judged that it was not felony, and ordered the "felonice" to be blotted from the indictment. They thought, however, that the clause in the law, on which the indictment was found, was not unconstitutional, because in the enumeration of the powers of congress, they are to take care of foreign commerce, and to pass all laws necessary for that purpose.

A question then arose, whether, on this verdict, the prisoners might be punished for a misdemeanor. This was argued. The authorities did not seem to justify it. THE COURT would have arrested the judgment, had not the motion for an arrest been withdrawn by the counsel for the prisoners, who must otherwise have been exposed to a second prosecution.

This trial commenced on Friday, October 24, and continued till the following Monday. The jury returned their verdict on Tuesday morning. On the· following Saturday the prisoners were brought up for sentence. Salter was ordered to pay a fine of two hundred dollars, and to be imprisoned six months. Carnes and Bruce were fined the same sum each, and imprisoned two months. Bullock and Smith were fined forty dollars each, and imprisoned three months.